

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
:
DUANE READE INC.,                               :
:
         Plaintiff,                             : 07 Civ.
:
         - against -                            : COMPLAINT AND JURY
: DEMAND
ST. PAUL FIRE AND MARINE INSURANCE              :
COMPANY,                                        :
:
         Defendant.                             :
:
------------------------------------------------x

Plaintiff Duane Reade Inc. ("Duane Reade"), by its attorneys, Davis Polk &
Wardwell, for its Complaint alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.       Duane Reade Inc. is a corporation duly organized and existing under the
laws of the State of Delaware, with its principal office and place of business at 440 Ninth
Avenue, New York, New York.  Duane Reade operates more than 200 drug stores in the
New York metropolitan area.

2.       Defendant St. Paul Fire and Marine Insurance Company ("St. Paul") is a
corporation duly organized and existing under the laws of the State of Minnesota, with its
principal office and principal place of business in St. Paul, Minnesota.

3.       This Court has subject matter jurisdiction over this action pursuant to 28
U.S.C. § 1332.  The matter in controversy is between citizens of different states and the
amount in controversy exceeds $75,000, exclusive of interest and costs.

4.       This Court has personal jurisdiction over St. Paul pursuant to §§ 301 and
302(a)(1) of the New York Civil Practice Law and Rules.  This action arises out of a
contract for insurance between St. Paul and Duane Reade that was performable in whole
or in part in New York.  In addition, this action arises out of St. Paul's transaction of
business in New York.

5.       Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (2)
and 1391(c).

## SUMMARY OF ACTION

6.     This action seeks to enforce Duane Reade's rights, entitlements, and obligations under an insurance policy issued by St. Paul that was in effect during the terrorist attacks of September 11, 2001, at which time a Duane Reade store located within the World Trade Center was destroyed. A previous action in this Court resulted in an August 20, 2003 order directing an appraisal, an opinion from the United States Court of Appeals for the Second Circuit that was issued on June 22, 2005, and an appraisal award, issued on June 5, 2006, for a portion of Duane Reade's insured business interruption losses. By virtue of the paragraphs pleaded herein, Duane Reade seeks (1) confirmation of the June 5, 2006 appraisal award, under which it is owed $5,631,967 by St. Paul, as partial payment of losses incurred as a result of the September 11, 2001 attack and (2) additional relief for other losses covered by the insurance policy.

## GENERAL ALLEGATIONS

### The Policy

7.     On October 1, 2000, Duane Reade and St. Paul entered into a contract for insurance coverage, Policy No. 144SP0725 (the "Policy"), for which Duane Reade, the Insured, paid St. Paul, the Insurer, the required premium. A copy of the Policy is attached hereto as Exhibit A and is incorporated herein by reference.

8.     The stated term of the Policy is October 1, 2000 through October 1, 2001. See Policy § 1.

9.     The Policy insures Duane Reade against losses resulting from, inter alia, interruptions in Duane Reade's business, see Policy § 2 (Coverage F - Business Interruption/Contingent Business Interruption) and also against certain losses resulting from damage to or destruction of Duane Reade's leased premises and other properties that attract potential customers to Duane Reade's stores. See id. (Coverage D - Leasehold Interest); id. § 50 (Attraction Properties). The Policy caps St. Paul's total potential liability to Duane Reade at $150,000,000, see id. § 8, and it provides for a $10,000 per-occurrence deductible. See id. § 11(a).

10.    The Policy obligates St. Paul to pay Duane Reade's claims for losses suffered as a result of "Business Interruption" and "Contingent Business Interruption," as those terms are defined in Coverage F of Section 2 of the Policy, if such interruptions result from "a peril, not excluded under this policy, causing direct physical loss or damage to any Real or Personal Property whether insured or not . . . ." Id. § 2 (Coverage F at ¶ 1).

11.    The Policy defines the "Perils Insured" as "all risk of direct physical loss or damage from any cause whatsoever except as hereinafter excluded . . . ." Id. § 6.

2

12.     The coverage purchased by Duane Reade provides various terms and conditions regarding the existence and calculation of Business Interruption and Contingent Business Interruption losses, which the Policy provides shall be insured "on the basis of ACTUAL LOSS SUSTAINED by the [Insured], consisting of the net profit which is thereby prevented from being earned . . . ." Id. § 12 (Time Element at ¶ A) (emphasis in original).  The Policy "also covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy . . . ." Id. § 12 (Time Element at ¶ E).

13.     The Policy provides for coverage of "Leasehold Interest" losses for the "ACTUAL LOSS SUSTAINED by the [Insured] resulting from necessary untenantability due to the cancellation of a lease by any party other than the [Insured] . . . when such untenantability results from direct physical loss or damage to or destruction of leased premises, by the perils insured against." Id. § 2 (Coverage D) (emphasis in original); see also id. § 12 (Time Element at ¶ C(5)).

14.     The Policy also covers "the Actual Loss Sustained by the [Insured] directly resulting from the interruption of the [Insured's] operation caused by damage to or destruction of Real or Personal property at Attraction Properties." Id. § 50. "Attraction Properties" are defined as properties "within one statute mile of the [Insured's] location, not operated by the [Insured], which attract potential customers to the [Insured's] location." Id.

15.     The Policy contains a section entitled "Period of Restoration and/or Indemnity" which provides that "[t]he measure of recovery or period of indemnity shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such property that has been destroyed or damaged, and shall commence with the date of such destruction or damage and shall not be limited by the date of expiration of this policy . . . ." (the "Restoration Period"). See id. § 12 (Time Element at ¶ E).

## The World Trade Center Loss

16.     Duane Reade's highest-volume and most profitable store was Store 114, which was located within the World Trade Center (the "WTC Store").  By virtue of Duane Reade's exclusive lease with the Port Authority of New York and New Jersey (the owner of the World Trade Center), Duane Reade's store was the only one of its kind in the World Trade Center complex.  During the average workday, hundreds of thousands of people worked in or traveled through the World Trade Center.  Because of its unique, high-traffic location and exclusive lease, the WTC Store was one of the most profitable drug stores in the United States on a per-square-foot basis.

17.     On September 11, 2001, while the Policy was in full force and effect, the World Trade Center and the WTC Store were completely destroyed as a result of a terrorist attack (the "WTC Loss").

3

18.     Duane Reade duly notified St. Paul that it had suffered a covered business interruption loss under the Policy.

19.     St. Paul responded to Duane Reade's notification and, in due course, acknowledged that the WTC Loss fell within the terms of the Policy and that St. Paul would provide some amount of coverage.

20.     With the existence of coverage resolved, St. Paul and Duane Reade hired accountants, conducted studies, and analyzed other Duane Reade store information for the purpose of quantifying the magnitude of Duane Reade's business interruption losses and extra expenses incurred.  Based upon prevailing time estimates for the reconstruction of the World Trade Center, Duane Reade estimated that its total loss, which would depend upon the time actually needed to restore the World Trade Center, would be between $80 million and $150 million.

21.     In March 2002, St. Paul informed Duane Reade that, by its calculation, Duane Reade's claim for business interruption losses for the WTC Store totaled only $9,863,853, based upon St. Paul's unilateral determination that the Restoration Period would be only 9 months.  Duane Reade disagreed with and challenged the legal and factual bases for St. Paul's determination.

22.     In May 2002, due to mounting expenses and losses, Duane Reade accepted a $9,863,853 partial payment (the "Partial Payment") to satisfy a portion of the damages incurred by reason of its WTC Loss.  St. Paul acknowledges that Duane Reade's acceptance of the Partial Payment did not fully dispose of Duane Reade's claims pursuant to the Policy.

23.     In particular, Duane Reade challenged St. Paul's contention that the WTC Store could be replicated or "restored" within 9 months plus a 12-month "Extended Recovery Period" as provided for in the Policy.  See Policy § 13(C).

### The 2002 Action

24.     On September 24, 2002, in response to St. Paul's refusal to pay the full amount of Duane Reade's business interruption loss, Duane Reade initiated an action in the United States Court for the Southern District of New York (the "2002 Action"), which was assigned to the Honorable Jed S. Rakoff and given docket number 02 Civ. 7676 (JSR).

25.     The initial complaint filed in the 2002 Action (the "2002 Complaint") sought relief that included:  (1) contractual damages based on St. Paul's breach of the Policy's business interruption coverage (see 2002 Compl. ¶¶ 31-37); and (2) a declaration that the Restoration Period consisted of "the actual time period that would, or will, be required to restore Duane Reade's operations to the kind, quality, and level which existed at the WTC Store prior to the terrorist attacks and that such Restoration Period is

4

coterminous with the time necessary to rebuild the complex which will replace the World Trade Center" (id. ¶¶ 38-42).

26.     On October 31, 2002, St. Paul filed its Answer and Affirmative Defenses in the 2002 Action (the "2002 Answer"), in which it asserted that "the Restoration Period applicable to the WTC Store [is] nine (9) months with a twelve (12) month Extended Period of Indemnity . . . ." (2002 Answer at ¶ 36; see also id. at ¶ 19), and that the total value of the compensation to which Duane Reade was entitled pursuant to the Business Interruption coverage was no greater than the $9,863,853 that St. Paul had paid to Duane Reade in May 2002.  (See id. at ¶ 19).

27.     In an amended pleading filed on January 31, 2003 (the "Amended Answer"), St. Paul repeated its prior position with respect to the duration of the Restoration Period (see Am. Answer ¶¶ 19, 36) and also asserted affirmative defenses and counterclaims based on the so-called "Loss of Market Exclusion" set forth in Section 7(C) of the Policy and on allegations that Duane Reade had misrepresented whether any portion of its claimed losses were subject to the Loss of Market Exclusion.  (See id. (Affirmative Defenses and Counterclaim)).  A further amended pleading filed by St. Paul on August 6, 2003 (the "Second Amended Answer") reiterated St. Paul's previously stated position on the duration of the Restoration Period.  (See Second Am. Answer at ¶ 19.)

28.     By telephonic ruling dated April 4, 2003 and Memorandum Order dated April 30, 2003, Judge Rakoff dismissed without prejudice the 2002 Complaint's contract claims as unripe because no proof of loss had been filed, allowed the 2002 Complaint's declaratory judgment claims to proceed, and denied St. Paul's motion to compel appraisal on the grounds that it was premature in light of the existence of issues of law to be determined by the Court.  See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 261 F. Supp. 2d 293, 295-96 (S.D.N.Y. 2003).

29.     On April 4, 2003, Duane Reade filed a Sworn Statement in Proof of Loss. On June 25, 2003, Judge Rakoff granted Duane Reade leave to re-assert its contract claims.  See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 279 F. Supp. 2d 235, 236 n.1 (S.D.N.Y. 2003).  On July 2, 2003, Duane Reade filed a First Amended Complaint.  A Second Amended Complaint was filed on July 3, 2003, and a Third Amended Complaint was filed on July 8, 2003.  The claims asserted in the Third Amended Complaint are largely identical to those asserted in the 2002 Complaint.

30.     On April 11, 2003, the parties filed respective motions for summary judgment.  These motions dealt largely with the declaratory relief sought concerning the duration of the Restoration Period and with the applicability of the Loss of Market Exclusion.

31.     Judge Rakoff denied St. Paul's motion for summary judgment in its entirety, and Duane Reade's motion was granted in part and denied in part.  See Duane Reade, 279 F. Supp. 2d at 236.  In these rulings, Judge Rakoff held that the Restoration

5

Period was the period of time before Duane Reade "could resume functionally equivalent operations in the location where its WTC store once stood . . . ." Id. at 239. Judge Rakoff also held that the Restoration Period could not extend beyond December 31, 2007 (the expiry of the leasehold in existence for the WTC Store at the time of the WTC Loss) unless Duane Reade could prove at trial that the lease would have been renewed but for the events of September 11, 2001. Id. In addition, Judge Rakoff ordered calculation by the appraisal panel prescribed by the Policy (the "Appraisal Panel") of the exact duration of the Restoration Period. Id. at 242. Judge Rakoff ordered a bench trial on the lease renewal issue and other issues. Id. Finally, he dismissed all of St. Paul's counterclaims and those of its affirmative defenses that asserted that Duane Reade's losses were barred by the Policy's Loss of Market Exclusion and that Duane Reade had misrepresented or concealed material facts. See id.

32.     In July 2003, Judge Rakoff dismissed without prejudice the contract claims asserted in the Third Amended Complaint on the grounds that the valuation of these claims had to be submitted to the Appraisal Panel before Duane Reade could claim that a breach had occurred. See Hr'g Tr. 10, July 23, 2003. Judge Rakoff also ruled that the declaratory judgment claims could proceed. See id. at 9.

33.     After a bench trial on the lease renewal issue and other issues, Judge Rakoff rendered his decision that but for the events of September 11, 2001, Duane Reade's lease on the WTC Store would have been renewed "for many years to come, probably ten years" beyond December 31, 2007. See Trial Tr. 9, Sept. 22, 2003. The effect of the lease-renewal finding was that in the event that the Appraisal Panel decided that the Restoration Period would run beyond December 31, 2007, Duane Reade would have been entitled to recovery for the full duration of that period.

34.     At the request of the parties, the Court directed the entry of judgment awarding declaratory judgment to Duane Reade and dismissing its breach of contract claims without prejudice. See Order dated Sept. 25, 2003. Judgment was entered on October 3, 2003, and St. Paul filed a notice of appeal to the Court of Appeals for the Second Circuit on October 10, 2003.

35.     Thereafter Duane Reade moved to compel appraisal. On January 23, 2004, Judge Rakoff granted this motion. See Hr'g Tr. 4, 20, Jan. 23, 2004, Order dated Jan. 26, 2004.

### The 2005 Appraisal Award

36.     After exchanging reports before the Appraisal Panel in April, September and December 2004, and then presenting direct testimony and appraisal briefs in April 2005, an appraisal hearing was held on April 25-29, 2005.

37.     The Appraisal Panel rendered a decision in June 2005 largely in favor of Duane Reade, determining that Duane Reade was entitled to a Restoration Period of eight years plus 50% recovery for the Extended Period during the ninth year. Based on that determination and others about Duane Reade's profits and rate of profit growth, the

6

Appraisal Panel awarded Duane Reade $40.7 million of covered business interruption losses, over and above the 2002 Partial Payment of $9,863,853.

### The Second Circuit Opinion

38.     On June 22, 2005, the Second Circuit issued an opinion affirming, as modified, Judge Rakoff's definition of the Restoration Period.  See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 399 (2d Cir. 2005).

39.     The Second Circuit stated that, with respect to the Restoration Period for the Business Interruption claim, "what is to be hypothesized is the time it would take to rebuild, repair, or replace the functional equivalent of the store Duane Reade lost, not the WTC complex that once surrounded it," and that "[o]nce Duane Reade could resume operations in a permanent location reasonably equivalent to the site of its former store at the WTC, the Restoration Period would be at an end."  Id. (emphasis in original).

40.     The Second Circuit further stated that losses caused "not by the interruption, but by the relocation of a business and the concurrent loss of benefits of the original site, such as increased foot traffic, entrenched customer base, or superior location" are "addressed exclusively by the Leasehold Interest clause."  Id. at 397-98.

### The 2006 Appraisal Award

41.     In view of the Second Circuit's opinion, the Appraisal Panel asked for further briefing regarding the Second Circuit's interpretation of the Restoration Period and also for documentary evidence regarding the duration of the period so defined.

42.     On June 5, 2006, the Appraisal Panel issued an award (the "Partial Award"), relating to Duane Reade's covered losses under the Business Interruption provision of the Policy.  This Partial Award reduced Duane Reade's covered Business Interruption losses over and above the 2002 Partial Payment from the previously awarded $40.7 million to $5,631,967, including interest owed.  The Partial Award included a 24-month Period of Restoration for the Business Interruption losses suffered as a result of the destruction of the WTC Store, and a one-year extended period of recovery.  A copy of the Partial Award is attached hereto as Exhibit B and incorporated herein by reference.

43.     Based on the Appraisal Panel's interpretation of the Second Circuit's ruling, the Partial Award reduced the amount of Duane Reade's covered losses under the Business Interruption provisions of the Policy.  The Appraisal Panel stated that, "based on the 2nd Circuit's decision related to coverage, (1) any difference in the cost of leasing the replacement property and (2) any differences caused by the move of the store to a reasonably equivalent location and the concurrent loss of benefits of the WTC, such as increased foot traffic, entrenched customer base, or superior location is properly covered by the Leasehold Improvement [sic] clause and not the Business Interruption clause."  Partial Award at 4.

7

44.     By letter dated June 19, 2006, St. Paul disavowed any obligation to pay Duane Reade under the Partial Award, and instead claimed that Duane Reade owed St. Paul $135,801.  The disavowal was reiterated by St. Paul in a letter dated August 7, 2006.  Such disavowal breached St. Paul's obligation under the Policy to pay the Partial Award.

### Request for Confirmation of 2006 Appraisal Award and for Permission to Amend the Complaint in the 2002 Action

45.     On July 20, 2006, Duane Reade filed a Sworn Statement in Partial Proof of Loss for the WTC Loss for $65,757,242 over and above the 2002 Partial Payment (the "Partial Proof of Loss").  The Partial Proof of Loss included losses that both the Second Circuit and the Appraisal Panel had stated were covered under the Leasehold Interest provisions of the Policy, as well as losses covered under the Attraction Property and Contingent Business Interruption provisions of the Policy.  A copy of the Partial Proof of Loss is attached hereto as Exhibit C.

46.     By its August 7, 2006 letter (see ¶ 44 above), St. Paul disclaimed any obligation to pay Duane Reade for the Partial Proof of Loss.

47.     On September 27, 2006, Duane Reade submitted a letter to Judge Rakoff requesting permission to move for leave to file a Fourth Amended Complaint.  By Memorandum Order dated December 26, 2006, Judge Rakoff denied this request, on the basis that final judgment had been entered in the 2002 Action.  See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., --- F. Supp. 2d ----, No. 02 Civ. 7676 (JSR), 2006 WL 3794293, at *2 (S.D.N.Y. Dec. 26, 2006).

## FIRST CLAIM FOR RELIEF

### (Confirmation of Partial Award)

48.     Duane Reade incorporates by reference the foregoing paragraphs 1 through 47 of this Complaint as if set forth here again in full.

49.     On September 11, 2001, Duane Reade suffered a loss within the insuring provisions of the Policy, inasmuch as its business of operating a retail drug store at its WTC Store was necessarily interrupted by the terrorist attacks upon the World Trade Center, a "peril" covered under the Policy.  The WTC Loss was directly and immediately caused by direct physical loss or damage to insured property.

50.     Duane Reade gave St. Paul timely and proper notice of the WTC Loss.  Thereafter, Duane Reade provided St. Paul with extensive information regarding both its operations and the nature of the loss, and thereafter Duane Reade allowed St. Paul to adjust the WTC Loss.  Additionally, Duane Reade provided St. Paul with detailed financial information regarding the WTC Loss and engaged accountants and other experts to compile data so as to meaningfully respond to St. Paul's requests for information.

51.     Duane Reade has duly performed and complied with all the terms and conditions of the Policy, which provides an affirmative duty upon St. Paul to compensate its insured if it suffered a loss due to business interruption for any reason not excluded by the Policy.

52.     The Policy provides that "[a]n award in writing of any two [appraisers] shall determine the amount of loss." Policy § 37. The Policy further states that "[a]ll adjusted claims shall be due and payable no later than 30 days after presentation . . . ." Id. § 32.

53.     As alleged above, the Partial Award determining Duane Reade's insured losses under the Business Interruption provisions of the Policy was announced by the Appraisal Panel on June 5, 2006, and St. Paul has refused to pay the Partial Award. Duane Reade is entitled to a judgment confirming the Partial Award, plus an award of interest for the period of time that has elapsed since the Partial Award was made.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract:  Partial Award)

54.     Duane Reade incorporates by reference the foregoing paragraphs 1 through 47 of this Complaint as if set forth here again in full.

55.     Duane Reade has duly performed and complied with all the terms and conditions of the Policy, which provides an affirmative duty upon St. Paul to compensate its insured if it suffered a loss due to business interruption for any reason not excluded by the Policy.

56.     Duane Reade gave St. Paul timely and proper notice of the WTC Loss. Thereafter, Duane Reade provided St. Paul with extensive information regarding both its operations and the nature of the loss, and thereafter Duane Reade allowed St. Paul to adjust the WTC Loss. Additionally, Duane Reade provided St. Paul with detailed financial information regarding the WTC Loss, and engaged accountants and other experts to compile data so as to meaningfully respond to St. Paul's requests for information.

57.     The Policy provides that "[a]n award in writing of any two [appraisers] shall determine the amount of loss." Policy § 37. The Policy further states that "[a]ll adjusted claims shall be due and payable no later than 30 days after presentation. . . ." Id. § 32.

58.     As alleged above, the Partial Award determining Duane Reade's insured losses under the Business Interruption provisions of the Policy was announced by the Appraisal Panel on June 5, 2006, and St. Paul has refused to pay the Partial Award. St. Paul's refusal to pay the Partial Award constitutes a material breach of its contractual obligations under the Policy.

59.     As a direct and proximate result of St. Paul's breach of its contract, as alleged herein, Duane Reade has been deprived of the benefits of coverage under the Policy, has been damaged as heretofore alleged, and has incurred substantial additional costs in an amount to be proved at trial.

### THIRD CLAIM FOR RELIEF

**(Declaratory Relief:  WTC Loss)**

60.     Duane Reade incorporates by reference the foregoing paragraphs 1 through 47 of this Complaint as if set forth here again in full.

61.     There at present exists an actual and continuing controversy between Duane Reade, on the one hand, and St. Paul, on the other hand, regarding their respective rights and duties as they relate to Duane Reade's entitlement to coverage pursuant to the Policy.

62.     Duane Reade contends that, pursuant to the Policy's coverages, Duane Reade is entitled to recover under the Leasehold Interest, Attraction Properties, and Contingent Business Interruption provisions in the amount sworn to in its Partial Proof of Loss.

63.     St. Paul has informed Duane Reade, by words and conduct, that St. Paul will not pay Duane Reade any losses claimed under the Leasehold Interest, Contingent Business Interruption or Attraction Properties provisions of the Policy because St. Paul believes that such claims cannot be made under the Policy.

64.     Duane Reade desires a judicial determination and declaration that its understanding of its rights under the Policy is correct.

65.     At this juncture, a judicial declaration is necessary and appropriate under the circumstances in order that Duane Reade, on the one hand, and St. Paul, on the other hand, may ascertain their respective rights and duties under the Policy and otherwise.

### FOURTH CLAIM FOR RELIEF

**(Breach of Contract:  WTC Loss)**

66.     Duane Reade incorporates by reference the foregoing paragraphs 1 through 47 of this Complaint as if set forth here again in full.

67.     The Policy obligates St. Paul to pay Duane Reade for the losses that resulted from the destruction of Duane Reade's Leasehold Interest in the WTC Store, for losses that are compensable pursuant to the Policy's Contingent Business Interruption

provisions, and for losses that resulted from the destruction of the WTC generally as an Attraction Property pursuant to the Policy's Attraction Properties provisions.

68.     Duane Reade gave St. Paul timely and proper notice of these losses and has duly performed and complied with all the terms and conditions of the Policy.

69.     St. Paul has informed Duane Reade, by words and conduct, that St. Paul will not pay Duane Reade any losses claimed under the Leasehold Interest, Contingent Business Interruption or Attraction Properties provisions of the Policy because St. Paul believes that such claims cannot be made under the Policy.

70.     As a direct and proximate result of St. Paul's breach of its contract, as alleged herein, Duane Reade has been deprived of the benefits of coverage under the Policy, has been damaged as heretofore alleged, and has incurred substantial additional costs in an amount to be proved at trial.

WHEREFORE, Duane Reade prays for judgment as follows:

**On the First Claim for Relief** (Confirmation of Partial Award):

1.     For a confirmation of the Partial Award and entry of judgment in the amount of the Partial Award plus interest for the period since the Partial Award was announced by the Appraisal Panel;

**On the Second Claim for Relief** (Breach of Contract (Partial Award)):

2.     For compensatory damages in accordance with proof at trial;

**On the Third Claim for Relief** (Declaratory Relief (WTC Loss)):

3.     For a declaration of rights that, pursuant to the Policy's Leasehold Interest provisions, Duane Reade is entitled to compensation for the loss of benefits derived from the WTC Store leasehold, which includes the profits generated from the attendant benefits of this specific interest; for compensation for losses covered under the Policy's Contingent Business Interruption provisions; and for compensation for covered losses resulting from the destruction of the World Trade Center as an Attraction Property within the meaning of the Policy.

**On the Fourth Claim for Relief** (Breach of Contract (WTC Loss)):

4.     For compensatory damages in accordance with proof at trial;

11

**As to All Claims for Relief**:

5.      For costs of suit herein;

6.      For pre- and post-judgment interest on all sums awarded; and

7.      For such other and further legal, equitable or other relief as this Court may deem just and proper.

## **JURY DEMAND**

The Plaintiff hereby demands a trial by jury on all issues and claims so triable.

Dated: New York, New York
January 24, 2007

DAVIS POLK & WARDWELL

By: _James W. B. Benkard_

James W.B. Benkard (JB 4914 )

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Attorneys for Duane Reade Inc.

13

# A 43

**144SP0390**
FORMER POLICY NUMBER

☐ ST. PAUL FIRE AND MARINE INSURANCE COMPANY

☐ ST. PAUL MERCURY INSURANCE COMPANY

NAME AND ADDRESS OF INSURED
Duane Reade, Inc. et al
440 Ninth Avenue
New York NY 10001

☐ ST. PAUL GUARDIAN INSURANCE COMPANY

**144SP0725**
CURRENT POLICY NUMBER

AGENT
Marsh USA, Inc.
1166 Avenue of the Americas
New York NY 10036-2774

☐ Herein called the Company. A Capital Stock Company, St. Paul, Minnesota

## The St Paul

| Policy Period From | To | Amount Insured | Rate | Premium | |
|---|---|---|---|---|---|
| 10/01/2000 | 10/01/2001 | $150,000,000 p/o $150,000,000 | various | $157,000.00 | $977.88 |

At 12:01 A.M., Standard Time at place of issuance as to each of said dates.
Plus surcharge/surtax

FORMS ATTACHED:
Broker Manuscript Form

Unless physically deleted by the Company, the following clauses shall be paramount and shall supersede and nullify any contrary provision of the Policy.

This Policy does not insure against loss or damage caused by or resulting from:

(1) Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual impending or expected attack, (a) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or (b) by military, naval or air forces; or (c) by an agent of any such government, power, authority or forces;

(2) Any weapon of war, employing atomic fission or radioactive force whether in time of peace or war;

(3) Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or Customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

It is agreed that if this Policy insures against the peril of Fire, Clause A below shall apply, but if this Policy does not insure against the peril of Fire, Clause B below shall apply, as follows:

A. This Company shall not be liable for loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against in this Policy; however, subject to the foregoing and all provisions of this Policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this Policy.

B. This Company shall not be liable for loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against in this Policy.

**THIS POLICY IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING STIPULATIONS AND CONDITIONS,** together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto; and no officer, agent or other representative of this Company shall have power to waive or be deemed to have waived any provision or condition of this Policy unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this Policy exist or be claimed by the Insured unless so written or attached.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY ONLY: *Provisions Required by Law to be Stated in this policy: - "This Policy is issued under and in pursuance of laws of the State of Minnesota, relating to Guaranty Surplus and Special Reserve Funds." Chapter 437, General Laws of 1909.*

In Witness Whereof, this Company has executed and attested these presents; but this Policy shall not be valid unless countersigned by a duly authorized Agent of the Company.

Countersignature Date        Countersigned At        Agent

**SP 8060**

13117 Rev 1-91 Printed USA

# A 44

## CONDITIONS

**MISREPRESENTATION OR FRAUD.**

This Policy shall be void if the Insured has concealed or misrepresented any material or circumstances concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or false swearing by the Insured touching any matter relating to this insurance or the subject thereof, before or after a loss.

**NOTICE OF LOSS.**

The Insured shall as soon as practicable report to this Company or its agent every loss or damage which may become a claim under this Policy and shall also file with Company or its agent within ninety (90) days from date of loss a detailed sworn proof of loss. Failure by the Insured to report the said loss or damage and to file such sworn proof of loss as hereinbefore provided shall invalidate any claim under this Policy for such loss.

**EXAMINATION UNDER OATH.**

The Insured shall submit, and so far as is within his/her or their power shall cause all other persons interested in the property and members of the household and employees to submit, to examinations under oath by any persons named by the Company, relative to any and all matters in connection with a claim and subscribe the same; and shall produce for examination all books of account, bills, invoices, and other vouchers or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or its representatives, and shall permit extracts and copies thereof to be made.

**SETTLEMENT OF LOSS.**

All adjusted claims shall be paid or made good to the Insured within sixty (60) days after presentation and acceptance of satisfactory proof of interest and loss at the office of this Company. No loss shall be paid hereunder if the Insured has collected the same from others.

**NO BENEFIT TO BAILEE.**

This insurance shall in no wise inure directly or indirectly to the benefit of any carrier or other bailee.

**SUBROGATION.**

In the event of any payment under this Policy, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization, and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after loss to prejudice such rights.

**PAIR, SET OR PARTS.**

It is understood and agreed that, in the event of loss of or damage to any article or articles which are a part of a set, the measure of loss of or damage to such article or articles shall be a reasonable and fair proportion of the total value of the set, giving consideration to the importance of said articles; but in no event shall such loss or damage be construed to mean total loss of set.

In case of loss or injury to any part of the insured property consisting, when complete for sale or use, of several parts, this Company shall only be liable for the insured value of the part lost or damaged.

**SUE AND LABOR.**

In case of loss or damage, it shall be lawful and necessary for the Insured, his/her or their factors, servants and assigns, to sue, labor, and travel for, in and about the defense, safeguard and recovery of the property insured hereunder, or any part thereof without prejudice to this insurance; nor shall the acts of the Insured or this Company, in recovering, saving and preserving the property insured in case of loss or damage, be considered a waiver or an acceptance of abandonment; to the charge whereof this Company will contribute according to the rate and quantity of the sum herein insured.

**SUIT.**

No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the Insured of the occurrence which gives rise to the claim. Provided, however, that if by the laws of the State within which this Policy is issued such limitation is invalid, then any such claims shall be void unless such action, suit or proceeding be commenced within the shortest limit of time permitted by the laws of such State to be fixed herein.

**APPRAISAL.**

If the Insured and the Company fail to agree to the amount of loss, each shall, on the written demand of either, made within sixty days after receipt of proof of loss by the Company, select a competent and disinterested appraiser, and the appraisal shall be made at a reasonable time and place. The appraisers shall first select a competent and disinterested umpire, and failing for fifteen days to agree upon such umpire, then, on the request of the Insured or the Company, such umpire shall be selected by a judge of a court of record in the state in which such appraisal is pending. The appraisers shall then appraise the loss, stating separately the actual cash value at the time of loss and the amount of loss, and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the amount of loss. The Insured and the Company shall each pay his/her or its chosen appraiser and shall bear equally the other expenses of the appraisal and umpire. The Company shall not be held to have waived any of its rights by any act relating to appraisal.

**CANCELLATION.**

This policy may be cancelled by the Insured by mailing to the Company written notice stating when thereafter such cancellation shall be effective. This Policy may be cancelled by the Company by mailing to the Insured at the address shown in this Policy or last known address written notice stating when no fewer than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice, and the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Insured or by the Company shall be equivalent to mailing.

If the Insured cancels, earned premiums shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premiums shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected and, if not then made, shall be made as soon as practicable after cancellation becomes effective. The Company's check or the check of its representative mailed or delivered as aforesaid shall be sufficient tender of any refund or premium due to the Insured.

**SP 8061**

# A 45

ST PAUL FIRE AND MARINE INSURANCE COMPANY
1800 SUTTER STREET, SUITE 300
CONCORD CA 94520

## NOTICE OF POLICY CONDITIONAL RENEWAL

med Insured & Mailing Address:

UANE READE, INC. ET AL
0 NINTH AVENUE
EW YORK NY 10001

Producer: 5962784

MARSH USA, INC.

1166 AVENUE OF THE AMERICAS,
40TH FLOOR
NEW YORK NY 10035

Policy No.: **144SP0725**
Type of Policy: COMMERCIAL PROPERTY
Date of Expiration: 10/01/2001 ; 12:01 A.M. Local Time at the mailing address of the Named Insured.

This notice is to advise that we are agreeable to renewing this policy subject to the
following: EFFECTIVE 10/01/01, RENEWAL WILL BE OFFERED WITH TERMS AND CONDITIONS THAT
WILL CHANGE POLICY LIMITS, RATE AND/OR COVERAGE.

The reason(s) for this conditional renewal is (are): YOUR PREMIUM IS TO BE DETERMINED.

The first named insured or his/her authorized agent/broker may request in writing loss information with
respect to this policy and previous policies we have written for you. We will provide this information
within 20 days from the date we receive your request.

TES POSTA:

nder: Plea

II

Named Insured

DUANE READE, INC. ET AL
440 NINTH AVENUE
NEW YORK NY 10001

Date Mailed:
22nd day of June,2001

*Carol Spragett-King*
Authorized Company Representative

EN3.0 ○0.11a
RM# C R971406NY101995

Copy for Branch Office

NYCR27NONE AP
06192001
Page 1 of 1

**SP 8062**

A   46

Policy No.: 144SP0725
Insured:     Duane Reade, Inc.


# NOTICE TO POLICYHOLDER


PURSUANT TO THE AGREEMENT BETWEEN YOUR BROKER AND THE
COMPANY, YOUR POLICY HAS BEEN AMENDED IN ACCORDANCE WITH
ENDORSEMENT NUMBERS  01 .


This policy is composed of various forms explaining the insurance coverage provided.  It
may also include one or more endorsements.  Endorsements are documents that
change the policy.  Endorsements may provide additional coverage to the policy.
Endorsements can also restrict or remove coverage provided in the policy.  THE
POLICY SHOULD BE READ CAREFULLY TO DETERMINE WHAT IS AND WHAT IS
NOT COVERED.

As the context may require, the words "you," "your," Insured," and "the Insured" refer to
the Named Insured shown in the Declarations.  The words "we," "us," "our," "Company,"
"the Company," and "this Company" refer to the Company providing this insurance.


CC: Marsh USA, Inc., New York, New York 10036

SP 8063

A  47

Duane Reade Inc, and Daboca Inc. Doing
Business as Duane Reade New York Partnership
and Duane Reade Holding Corp.

all subsidiaries, companies, corporations, trusts,
partnerships, joint ventures, associated companies,
associations, subsidiaries of the foregoing and
individuals which are now or may hereafter be owned by,
controlled by, operated by, directed by or subsidiary to
the Duane Reade Inc, all as at present or as may
hereafter be constituted, or acquired as Owners,
Lessee's, Vendees, Mortgagees, Trustees, or in any other
capacity if acting for themselves or for account of
others.

HEREINAFTER REFERRED TO AS THE "ASSURED"

SP 8064

# A 48

1.    TERM OF INSURANCE:

In consideration of the premium charged, this policy attaches and covers from October 1, 2000 to October 1, 2001 beginning and ending at 12:01 AM Eastern Standard Time (EST).

2.    COVERAGES:

This policy covers:

Coverage A - Real and Personal Property

1)    The interest of the Assured in all Real and Personal Property of every description owned by the Assured, used by the Assured, or intended for use by the Assured, all while located within the territorial limits of this policy including during installation, assembly, erection, fabrication, construction, building and while in transit.

2)    The interest of the Assured in Real and Personal Property of others in the Assured's care, custody, or control including the Assured's liability imposed by law or assumed by contract (written or oral), for such property, all while located within the territorial limits of this policy including during installation, assembly, erection, fabrication, construction, building and while in transit.

Coverage B - Extra Expense/Contingent Extra Expense

1)    The interest of the Assured in Extra Expense incurred in order to continue to conduct the Assured's business as a result of a peril, not excluded under this policy, causing direct physical loss or damage to any Real and/or Personal property whether insured or not; including while such property is in transit, or storage, during construction and/or erection and/or installation, and/or assembly, fabrication; including all interdependencies; including but not limited to loss or damage to EDP equipment or media, property of the Assured, property of others including property of Utility Companies supplying services to the Assured and property of supplier(s), property of suppliers of suppliers, property of customer(s), and property of customers of customers.

2)    The Extra Expenses incurred in order to continue to conduct the Assured's business, when as a result of an insured peril, delivery of materials, stock, merchandise or other property or services, to the

Page 2

A   49

Assured, or Assured's customers or suppliers, or suppliers of the
Assured's suppliers or customers of the Assured's customers is
partially or wholly prevented. The coverage under this paragraph is
understood to include prevention of access to the premises of the
Assured due to an insured peril.

Coverage C - Rental Value

The interest of the Assured in loss of Rental Income, or Rents as a tenant,
resulting from the necessary untenantability of a building or structure
caused by a peril, not excluded under this policy, causing direct physical
loss or damage to such building or structure, including property of others,
and including buildings or structures during installation, assembly,
erection, fabrication, construction and building all while located within the
territorial limits of this policy.

Coverage D - Leasehold Interest

The ACTUAL LOSS SUSTAINED by the Assured resulting from necessary
untenantability due to the cancellation of a lease by any party other than
the Assured, including from the cancellation of a lease resulting from order
or orders by any governmental authorities, when such untenantability
results from direct physical loss or damage to or destruction of leased
premises, by the perils insured against.

Coverage E - Accounts Receivable

1)   All sums due the Assured from customers, provided the Assured is
     unable to effect collection thereof as the result of loss of or damage
     by an Insured peril to records of accounts receivable;

2)   Interest charges on any loan to offset impaired collections pending
     repayment of such sums made uncollectible by such loss or damage
     by an insured peril.

3)   Collection expenses in excess of normal collection cost and made
     necessary because of such loss or damage by an insured peril;

4)   Other expenses, when reasonably incurred by the Assured in
     re-establishing records of accounts receivable following such loss or
     damage by an insured peril.

Coverage F - Business Interruption/Contingent Business Interruption

SP 8066

Page 3

## A 50

1)  The interest of the Assured in loss of earning (Business Interruption), including ordinary payroll, continuing expenses, loss of royalties and bonus programs as a result of an interruption of the Assured's business (either partial or total) if such interruption is a result of a peril, not excluded under this policy, causing direct physical loss or damage to any Real or Personal Property whether insured or not, including while such property is in transit, or storage, during construction and/or erection and/or installation, and/or assembly, fabrication including all interdependencies; including but not limited to loss or damage to EDP equipment or media, property of the Assured, property of others including property of Utility Companies supplying services to the Assured and property of suppliers, property of suppliers of suppliers and property of customers, property of customers of customers.

2)  The Business Interruption incurred, as defined above, when as a result of an Insured peril, delivery of materials, stock, merchandise or other property or services, to the Assured, or Assured's customers' or suppliers, or suppliers' of the Assured's suppliers or customers of the Assured's customers is partially or wholly prevented.  The coverage under this paragraph is understood to include prevention of access to the premises of the Assured due to an insured peril.

Coverage G - Electronic Data Processing Equipment

1)  Data processing systems including equipment and component parts thereof owned by the Assured or leased, rented or under the control of the Assured;

2)  Data processing media, meaning all forms of converted data and/or program and/or instruction vehicles employed in the Assured's data processing operation, being property of the Assured or property of others for which the Assured may be liable, including media for the account of the Assured while in the custody of an outside data processing organization.

Coverage H - Expediting Expense

This policy also covers the additional reasonable expenses incurred by the Assured to expedite the repair of property damaged including overtime and the extra cost of express of other rapid means of transportation by the insured perils so as to put the work on the same completion schedule as existed prior to the loss or damage.

SP 8067

Coverage I - Research and Development

This Policy covers direct physical loss or damage to research projects including, but not limited to, the value of time spent on research projects, and the extra expenses incurred in order to resume projects or otherwise minimize the time lost, resulting from or caused by a peril not otherwise excluded.

3.   EXTENSIONS OF COVERAGE:

The following shall be considered to be extensions to COVERAGES, as outlined in Section 2 above, where applicable, and shall be subject to the same Terms and Conditions, including but not limited to policy limits and retentions, as would apply to the COVERAGES to which these are extensions.

A)   The interest of the Assured including the Assured's liability imposed by law or assumed by contract whether written or oral, for property, as covered herein, of others which the Assured has a contractual or legal obligation to insure and/or a contractual or legal obligation for loss or damage for such property of others when such property has been sub-leased or contractually assigned to others (third parties), and at the option of the Assured, the interest of the owners of such property and/or the interests of sub-lessees and/or assignees.

B)   The interest of the Assured including the Assured's liability imposed by law or assumed by contract, whether written or oral, in Real and/or Personal Property of others while in the care, custody or control of transportation companies, forwarders, warehousemen, contractors, sub-contractors or bailees.

C)   The interest, at the option of the Assured, of contractors and/or sub-contractors, including property of others while in the care, custody or control of such contractors and/or sub-contractors in property covered under Coverage A, to the extent of the Assured's liability imposed by law or assumed by contract, whether written or oral, while located within the territorial limits of this policy including while in transit.

D)   Valuable papers and records, fine arts, manuscripts, drawings, EDP equipment and data processing media while located within the territorial limits of this policy including while in transit.

E)   The Assured's interest in building improvements and betterments in

SP 8068

Page 5

# A 52

buildings not owned by the Assured.

The company further agrees to consider the Assured, in the event of loss, in the position of sole and unconditional owner or such improvements and betterments, any contract or lease the Assured may have made to the contrary notwithstanding.

F)   The interest of the Assured including the Assured's liability, imposed by law or assumed by contract, whether written or oral, in Personal Property of the Assured's officers and employees while such property is located on the premises of the Assured (owned or leased), or while in the Employees' or officers' actual or constructive possession during business travel or use and at the option of the Assured the interest of officers and employees in such property.

G)   The Assured's contingent interest in the following shipments:

   1)   Shipped by the Assured under F.O.B. point of origin or other terms usually regarded as terminating the shipper's responsibility short of points of delivery.

   2)   Shipped by others to the Assured under C.I.F. terms or other terms usually regarded as obligating the shipper to procure property insurance and maintain it in force until destination.

   3)   Return shipments on property not accepted by the consignee.

   4)   At the Assured's option, as respects property in transit, the interest of shippers of property destined for the Assured, and the interest of consignees on property shipped by the Assured to others (regardless of any terms of sale to the contrary).

H)   <u>Sequential and/or consequential loss:</u>

This policy insures against sequential and/or consequential loss and resulting time element losses to the property insured caused by interruption of power, heat, air conditioning, refrigeration, or water supply resulting from direct physical damage by the perils insured against hereunder to any equipment used for refrigeration, cooling, humidifying, supplying water, dehumidifying, air conditioning, heating, generating, or converting power, including all connections and supply for transmission lines and pipes, and power generating equipment or power sources; provided such loss or damage is caused by power sources, water supply, etc. as defined above.

SP 8069

Further, in the event of direct physical loss or damage to any property by reason of any peril insured against and such damage, without the intervention of any other independent clause, results in a sequence of events which causes physical damage to other property insured by this policy, and/or the Assured sustains interruption of business as covered hereunder, then this policy will cover such resulting loss or damage.

I)   Debris Removal

In the event of direct physical loss or damage insured against and occurring during the term of this policy, the Company will pay:

a)   necessary and reasonable costs to remove debris of the property insured herein from the premises of the Insured; and/or

b)   cost of cleanup, at the premises of the Insured, made necessary as a result of such direct physical loss or damage.

c)   expense or cost to extract pollutants or contaminants or polluted land or water, however the Company's liabilty for this coverage shall not exceed $50,000 nor shall the annual aggregate liabilty of the Company for such losses exceed $50,000

It is a condition precedent to recovery under this extension that the Company shall have paid or agreed to pay for direct physical loss or damage to the property insured hereunder unless such payment is precluded solely by the operation of any deductible and that the Insured shall have given written notice to the company of intent to claim for cost of debris removal or cost to cleanup not later than twelve months after the date of such physical loss or damage.

Debris removal expense shall not be considered in the determination of values under this insurance.

J)   Prevention of Ingress/Egress

This policy is extended to cover the actual loss as covered hereunder limited to 4 weeks, when as a result of a covered peril ingress to or egress from the premises is prevented from direct physical loss or damage irrespective of whether the premises or property of the Assured shall have been damaged.

**SP 8070**

## A 54

K)    Off Premises Power

The insurance hereunder is extended to include liability for interruption of business resulting from direct physical loss or damage to or destruction of Off-Premises Public Utility Power, Transformer or Switching Stations, sub-stations or other Public Utility Services, including poles, towers and transmission lines furnishing; including but not limited to heat, light, power, gas, water or telephone service to property insured hereunder by a peril insured against.

L)    This policy also covers loss or damage:

1)    arising out of any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for shipments or to accept goods for delivery.

2)    occasioned by the acceptance by the Assured, by its agents, by its employees, or by its customers or suppliers of fraudulent bills of lading, shipping and delivery orders, or similar documents.

4.    PROPERTY EXCLUDED:

This policy does not cover:

A.    Currency, money, deeds, notes, securities, except Accounts Receivable as defined in Coverage E; growing crops and standing timber.

B.    Property to extent covered under the Insured's import or export Ocean Marine policies.

C.    Watercraft, animals except for research; fully assembled aircraft, fully assembled vehicles licensed for highway use when not on the Assured's premises and not being used for display or sales purposes.

D.    Land or water.  *OL*

E.    Growing Crops.

F.    Trees, Plants, Shrubs.

5.    TERRITORY:

SP 8071

Page 8

A 55

This policy covers within and between the fifty (50) states comprising the United States of America, its territories and possessions, the District of Columbia and Canada.

6.   PERILS INSURED:

This policy insures against all risk of direct physical loss or damage from any cause whatsoever except as hereinafter excluded, occurring within the *el-* period of this policy to the property covered hereunder.

7.   PERILS EXCLUDED:

This policy does not insure against loss or damage caused by the following:

A.   Infidelity or dishonesty of the Assured or any of his employees; however, willful acts of malicious intent shall not be deemed to be dishonest acts. This exclusion shall not apply to loss or damage resulting from the Assured voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense or from loss or damage by arson. This exclusion shall also not apply to Accounts Receivable or EDP Media or equipment including transit thereof or to any other property in transit.

B.   Errors in design, faulty workmanship or faulty materials, unless a loss from a peril not otherwise excluded ensues and then coverage shall apply only for the loss or damage caused by the ensuing peril. This exclusion only applies to the part or parts improperly designed. This exclusion shall not apply to Accounts Receivable or EDP Media or Equipment including Transit thereof or to any other property while in transit.

C.   Delay or loss of market, normal wear and tear.

D.   Pollution and contamination unless loss or damage from a peril insured against herein ensues and then coverage shall apply only for loss or damage caused by such ensuing peril or unless loss or damage is the result of an insured peril.

E.   Nuclear reaction or nuclear radiation all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote or be in whole or in part caused by, contributed to or aggravated by the peril(s) insured against in this policy; however, if fire, explosion or sprinkler leakage ensues, liability is specifically

SP 8072

A 56

assumed for loss by such ensuing fire, explosion or sprinkler leakage but not including any loss due to nuclear reaction, nuclear radiation or radioactive contamination.

This exclusion shall not be construed to exclude loss or damage caused by sudden and accidental radioactive contamination, including resultant radiation damage when such radioactive contamination arises out of material on a premises occupied by the Assured or which may contain property of the Assured.

While this policy shall cover against loss or damage caused by sudden and/or accidental radioactive contamination, including resultant radioactive contamination damage to property covered herein, it shall not apply if:

1)    Such radioactive contamination arises out of material not covered in this policy;

2)    at the time of such loss, that at the location involved there is a nuclear reactor capable of sustaining nuclear fission in a self-supporting chain reaction, or any new or used nuclear fuel which is intended for or which has been used in such a nuclear reactor, or any new or used nuclear fuel which is intended for or which has been used in a nuclear reactor.

F)   1)    Warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending, or expected attack;

        (a)    by any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces;

        (b)    or military, naval, or air forces;

        (c)    or by an agent of any such government, power authority, or forces;

2)    Any weapon employing atomic fission;

3)    Rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such occurrence;

SP 8073

Page 10

# A 57

4)      Seizure or destruction by order of public authority, except seizure or destruction by order of public authority to prevent the spread of fire or to prevent the continuation of, or increase in severity in any way of, any losses covered herein.

5)      Risks of contraband or illegal trade.

Notwithstanding the above provisions, F(1), (2), (3), (4) and (5), this insurance shall cover loss or damage directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities, or warlike operations, provided such agent is acting secretly and not in connection with any operation of armed forces (whether military, naval or air forces) in the country where the property is situated.  Nothing in the foregoing shall be construed to include any loss, damage, or expense caused by or resulting from any of the risks or perils excluded above, and in no event shall this insurance include any loss, damage, or expense caused by or resulting from any weapon of war employing atomic fission or radioactive force whether in time of peace or war.

G)      Mysterious disappearance or loss or shortage disclosed on taking inventory.

H)      Earthquake for locations in California.

I)      Normal settling, shrinkage, or expansion in building or foundation or shrinkage of walls, floors, or ceilings unless loss or damage from a peril insured herein ensues and then this policy shall cover only for such ensuing loss or damage.

J)      Loss or damage caused by or resulting from moth, vermin, termites or other insects, inherent vice, latent defect, contamination, rust, wet or dry rot, mold, dampness of atmosphere, smog or extremes of temperature unless loss or damage from a peril insured herein ensues and then this policy shall cover only for such ensuing loss or damage.

K)      Shrinkage, change in color, or texture, or finish unless the shrinkage, change in color, or texture, or finish is caused by an insured peril.

SP 8074

A  58

8.   LIMITS OF LIABILITY:

This policy shall not be liable for more than the following Limit of Liability for loss or damage applicable to coverages A, B, C, D, E, F, G, H, and I of Section 2:

$150,000,000       per occurrence for all locations as respects Property
                   Damage and Time Element subject to the following
       sublimits;
$50,000,000        per occurrence and in the annual aggregate for the peril
       of                             Earthquake.
$50,000,000        per occurrence and in the annual aggregate for the peril
       of Flood.
$25,000,000        per occurrence as respects Extra Expense.
$10,000,000        Newly Acquired Locations.
$10,000,000        per occurrence as respects Valuable Papers and
       Records.
$10,000,000        per occurrence as respects Accounts Receivables.
$50,000       per occurence as respects Pollution Cleanup from Land or
       Water.
$5,000,000 or 25% of loss per occurence for Debris Removal, whichever is
       greater.
$5,000,000 per occurrence as respects Fine Arts.
$5,000,000 per occurence as respects Off Premises Power.
$10,000,000        per occurrence as respects Demolition/Contingent
       Liability for Building       Laws/Increased Cost of Construction.
$10,000,000        per occurence as respects Error in Description.
$25,000,000        per occurence as respects EDP Equipment & Media.
4 Weeks       Ingress/Egress
4 Weeks       Civil & Military Authority

$100,000,000       per occurrence for Boiler & Machinery subject to the
       following                       sublimits:

$250,000       Expediting Expense
$250,000       Perishable Goods
$250,000       Computer Equipment
$250,000       Hazardous Substance
$250,000       CFC Refrigerants
$250,000       Water Damage
$250,000       Ammonia Contamination

# A 59

9.   PREMIUM AND PREMIUM ADJUSTMENT:

This policy is written in consideration of an annual premium of $157,000
for the period of October 1, 2000 to October 1, 2001.

10.   ADDITIONS AND DELETIONS CLAUSE:

In consideration of and subject to all its provisions and stipulations, this policy
is extended to cover newly acquired property.  Coverage under this clause shall
automatically commence when the Insured first acquires, leases, constructs or
otherwise acquires an insurable interest in such property, however, subject to
sublimits as listed in the declarations.

If any acquisition/divestiture having values representing 10% or more of the
total reported values of $316,884,915 is added and/or deleted during the course
of the policy year, an additional/return premium will be determined on a pro
rata basis from the effective date of such addition and/or deletion to the
expiration date of the policy year.

However, should any acquisition/divestiture having values representing less
than 10% of the total reported values referenced above take place during the
course of the policy year, there shall be no additional/return premium applied

11.   RETENTION/DEDUCTIBLES:

Underwriters shall not be liable for loss or damage under this policy until
the amount of loss arising out of any one occurrence is excess of the
retentions listed below and then only for the amount in excess of such
retentions subject to the policy limit of liability as stated in paragraph (8).

SP 8076

# A  60

a) $10,000 per occurrence for all losses covered under this policy.

24 Hour Waiting period, plus $10,000 deductible as respects Service Interruption.

2.   <u>VALUATION:</u>

In case of loss or damage as covered under this policy, the basis for adjustment shall be as follows:

<u>Real & Personal Property</u>

A)     All Real and Personal Property including Improvements and Betterments, except as listed below, at the actual repair or replacement cost at the time of loss or damage, with loss or damage ascertained on the Actual Replacement Cost of property similar in kind and quality. However, if real or personal property is not repaired or replaced, loss or damage will be ascertained on actual cash value at the time of loss or damage.

B)     Property of others at the Assured's contractual or legal obligation, or at the Assured's option the repair or replacement cost at the time of loss or damage.

C)     Finished stock or merchandise at the regular selling price less any applicable discounts or unincurred sales expenses, including stock or merchandise sold but not delivered.

D)     Stock in process at the cost of raw materials plus pro rated indirect and direct overhead charges including labor, plus percentage of completion profit.

E)     Valuable Papers and Records, Manuscripts, Drawings and data processing media and/or active data processing media shall be valued at but not limited to total reconstruction or recreation cost of such damaged property. If the aforementioned is not recreated or constructed, the Assured will receive the Value Blank.

F)     <u>Fine Arts</u>

The Assured shall have the option of one of the following:

a)     The actual replacement cost at the time of loss or damage with loss or damage ascertained on the actual replacement

SP 8077

Page 14

A   61

cost of property similar in kind and quality or;

b)   The fair market value at time of replacement or;

c)   The original purchase price or;

d)   The Assured's contractual or legal liability or;

e)   The amount as scheduled by endorsement.

G)   Property in transit at the applicable valuation as stated above plus all prepaid or incurred destination transportation charges, or at the option of the Assured, the invoice price.

iv)   <u>Definitions</u>

The following terms wherever used herein shall mean:

a)   "Gross Profit" The sum produced by adding to the Net Profit, the amount of the Insured Standing Charges, or if there be no Net Profit, the amount of the Insured Standing Charges less such as proportion of any net trading loss as the amount of the Insured Standing Charges bears to all the Standing Charges of the business.

b)   "Net Profit": The net trading profit (exclusive of all capital receipts and accretions and all outlay properly chargeable to capital) resulting from the business of the Insured after due provisions has been made for all Standing and other charges including depreciation, but before the deduction of any taxation chargeable on profits.

c)   "Turnover": The money paid or payable to the Insured for goods sold and delivered and for services rendered in course of the Insured's business.

d)   "Insured Standing Charges": All standing charges (except as excluded below).

The following shall in no event be deemed to be Standing Charges:

## A  62

(I)    Depreciation of Stock

(II)    Bad Debts

(III)    Wages and salaries other than salaries to permanent staff and wages to foremen and important employees whose services would not be dispensed with should the business be interrupted or interfered with.

### Time Element

A)    BUSINESS INTERRUPTION (DIRECT AND/OR CONTINGENT)

In the event of a Business Interruption loss as covered in this policy, it shall be adjusted on the basis of ACTUAL LOSS SUSTAINED by the Assured, consisting of the net profit which is thereby prevented from being earned, including ordinary payroll expenditures; and all charges and expenses to the extent that they must necessarily continue during the interruption of business, but only to the extent to which they would have been incurred had no loss occurred.

B)    EXTRA EXPENSE (DIRECT AND/OR CONTINGENT)

Extra Expense shall mean the excess of the total cost during the period of restoration of the damaged property chargeable to the operation of the Assured's business over and above the total cost that would normally have been incurred to conduct the business during the same period, had no loss or damage occurred.

C)    RENTAL INCOME AND RENTS

1)    The total anticipated gross rental income from tenant occupancy of the described property as furnished and equipped by the Assured, and

2)    The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Assured, and

3)    The fair Rental Value for any portion of said property which is occupied by the Assured.

4)    In the event the Assured is the lessee:

**SP 8079**

Page 16

A 63

The determined rental which the Assured is obligated to pay (including ground rents, accrued charges, real estate taxes and interest if the Assured shall be liable therefor) less such charges and expenses as do not necessarily continue.

5) This Company shall be liable for the ACTUAL LOSS SUSTAINED by the Assured as defined by above resulting directly from necessary untenantability, caused by damage to or destruction of property by the peril(s) insured against during the term of the policy, but not exceeding the reduction in rental value less charges and expenses which do not necessarily continue during the period of untenantability, for only such length of time as would be required to rebuild, repair or replace such part of the property herein described which has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy.

6) Such expenses as are necessarily incurred for the purposes of reducing any loss under this coverage but in no event shall the aggregate of such expenses exceed the amount by which the loss under this policy is hereby reduced.

D) LEASEHOLD INTEREST

The actual loss sustained by the Assured computed as:

The excess of Actual Rental Value of the premises over the Actual Rental Payable including any maintenance or operating charges paid by the Assured, during the unexpired term of the Assured's lease, whether the premises are occupied in whole or in part by the Assured or whether the premises are sub-let to other tenants. This total amount shall be payable to the Assured in the amount of the excess as defined above as follows:

1) The full amount for the first three months following loss or damage plus,

2) For the remainder of the unexpired lease, the sum which place at 8% interest, compounded annually, will be equivalent to the excess for each separate month of the remaining lease.

E) PERIOD OF RESTORATION AND/OR INDEMNITY

SP 8080

The measure of recovery or period of indemnity shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such property that has been destroyed or damaged, and shall commence with the date of such destruction or damage and shall not be limited by the date of expiration of this policy.

Expense to Reduce Loss:  This policy also covers such expenses' as are necessarily incurred for the purposes of reducing any loss under this policy, but in no event shall the aggregate of such expense exceed the amount by which the loss under this policy is thereby reduced.

Resumption of Operations:  As soon as practicable after any loss, the Assured shall resume complete or partial business operations and reduce or dispense with such additional charges and expense as are being incurred.

Expenses to Replace Finished Stock & Inventory:  This policy also covers expenses, in excess of normal, incurred in replacing finished stock.

Construction Coverage:  In the event of loss or damage by a peril insured against to property under construction and insured by this policy, the measurement of the resulting actual loss sustained shall be in accordance with the following:

(a)   Computed for a period of time equivalent to the time in which, with due diligence and dispatch, the property could be repaired or replaced.  This equivalent period of time shall be applied to the experience of the business after the business has reached planned level of production or level of business operations.  Neither period of time mentioned above shall be limited by the date of expiration named in this policy.

(b)   In determining the indemnity payable under this policy due consideration shall be given to the available experience of the business compiled after completion of the construction.

Extensions of the Period of Indemnity

1)   Interruption by Civil Authority:  This policy is extended to include the actual loss as covered hereunder, when, as a direct result of a covered peril, access to the premises is prohibited

SP 8081

by order of civil authority.  This extension is limited to 4 weeks following the interruption by the civil authority.

2)    Impounded Water:  In the event that water is used as a raw material or used for power or for other manufacturing purposes and is stored behind dams or in reservoirs is released from storage as a result of damage to or destruction of such dam, reservoir, or equipment connected therewith, by any peril insured against, this policy covers loss, if any, directly resulting from interruption of business and/or extra expense caused by lack of adequate water supply from such sources.

Experience of the Business:  In determining the amount of net profit, charges, and expenses covered hereunder for the purposes of ascertaining the amount of loss sustained, due consideration shall be given to the experience of the business before the date of damage or destruction and to the probable experience thereafter had no loss occurred.

F)    Accounts Receivable

When there is proof that a loss covered by this policy has occurred but the Assured cannot accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be based on the Assured's monthly statements and shall be computed as follows:

a)    determine the amount of all outstanding accounts receivable at the end of the same fiscal month in the year immediately preceding the year in which the loss occurs;

b)    calculate the percentage of increase or decrease in the average monthly total of accounts receivable for the twelve months immediately preceding the month in which the loss occurs, or such part thereof, as compared with such average for the same months of the preceding year;

c)    the amount determined under (a) above, increased or decreased by the percentage calculated under (b) above, shall be the agreed total amount of accounts receivable as of the last day of the fiscal month in which said loss occurs;

d)    the amount determined under (c) above shall be increased or

decreased in conformity with the normal fluctuation in the amount of accounts receivable during the fiscal month involved, due consideration being given to the experience of the business since the last day of the last fiscal month for which statement has been rendered.

There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records not lost or damaged, or otherwise established or collected by the Assured, and an amount to allow for probable bad debts which would normally have been uncollectible by the Assured. All unearned interest and service charges will be deducted.

13.  SUPPLEMENTARY COVERAGES:

A.  Demolition/Contingent Liability for Building Laws/
Increased Cost of Construction

In the event of physical Loss or Damage, as covered by this policy, this policy is extended to cover the following:

1)  The cost of replacement, demolition, removal and disposal occasioned by the enforcement of any law or ordinance which necessitates the demolition of any portion of any insured Building or Structure (or removal of contents thereof) which has not suffered damage, but only when some portion of the building structure or contents has suffered damage by an insured peril.

2)  The increased cost of construction, re-construction, repair and/or disposal occasioned by the enforcement of any law or ordinance, in force at the time such loss or damage occurs, regulating the construction, reconstruction, disposal or repair of buildings or structures.

3)  The increased Time Element loss to the Assured occasioned by the enforcement of any law or ordinance in force at the time such loss occurs, regulating demolition or disposal of any portion of any building, or regulating the construction disposal, reconstruction, or repair of buildings or structures including the increased Extra Expense loss as a result of the endorsement of such laws or ordinance due to physical loss or damage to property not owned or controlled by the Assured.

SP 8083

4)  In the event, that the Assured is obliged under the terms and conditions of any lease agreement or contract, to replace on a basis other than that indicated in the foregoing, it is understood and agreed that this policy will cover such obligation.

These extensions of coverage do not increase this policy's total limit of liability.

B)  <u>Fire Department Service Charges</u>

This policy is extended to cover expenses and/or charges, made by the Fire Department or similar Municipal organizations, made as a result of loss covered hereunder.

C)  <u>Extended Recovery Period</u>

This policy is extended to cover the Actual Loss Sustained by the Assured resulting from interruption of business for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Assured's business to the condition that would have existed had no loss occurred, commencing with the latter of the following dates:

a)  the date on which liability of the Company of loss resulting from interruption of business would terminate if the clause had not been attached to this policy or

b)  the date on which repair, replacement, or rebuilding of such part of the property as has been damaged is actually replaced; but in no event for more than twelve months from said later commencement date.

D)  <u>Extinguishing Agents Clause</u>

This policy is extended to cover the loss to foam or other fire extinguishing materials lost, expended, or destroyed in fighting fire involving property insured hereunder, including the loss to similar materials which may be brought off the premises for the purpose of extinguishing a fire already in progress at the time such materials are ordered and delivered.

E)  <u>Civil or Military Authority</u>

## A  68

This policy insures against loss caused by order of civil or military authority at the time of and for the purpose of preventing loss, or of preventing the continuation, or increase in, severity of any loss covered hereunder. This policy shall also insure loss or damage sustained when access to the premises is prohibited by order of civil or military authority.

F)  General Average/Salvage Charges

This policy is extended to cover General Average and/or Salvage Charges assessed the Assured.

G)  Impounded Water:

In the event that water is used as a raw material or used for power or for other manufacturing purposes and is stored behind dams or in reservoirs is released from storage as a result of damage to or destruction of such dam, reservoir, or equipment connected therewith, by any peril insured against, this policy covers loss, if any, directly resulting from interruption of business and/or extra expense caused by lack of adequate water supply from such sources.

14.  LOSS OCCURRENCE DEFINED:

A)  Loss Occurrence:

1)  Means the total loss by any peril or combination of perils insured against arising out of a single event;

2)  Each loss occurrence which involves the perils of tornado, windstorm, cyclone, hurricane or hail shall include all loss or damage wherever occurring occasioned by these perils which arise out of one atmospheric disturbance during a continuous period of 72 hours; however, if the United States Weather Bureau should declare that one single atmospheric disturbance had continued at the location(s) involved beyond a period of 72 hours, all loss or damage sustained during such extended period shall be included as a single loss occurrence.

3)  Each loss occurrence which involves the peril of earthquake, a series of earthquakes, or earth movement(s), shall include all loss, during a continuous period of 72 hours; however, if the

SP 8085

Page 22